# Westlaw.

Not Reported in A.2d
21 Conn. L. Rptr. 14
**(Cite as: 1997 WL 707106 (Conn.Super.))**

Page 1

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Connecticut.

Jennifer LESTRANGE
v.
TOWN of Oxford et al.

**No. CV 950052342S.**

Nov. 4, 1997.

Memorandum of Decision on Town of Oxford's Motion for Summary Judgment

CORRADINO.

**\*1** The plaintiff filed an action against the Town of Oxford on October 27, 1995. In that action, the plaintiff claimed her rights were violated under 42 U.S.C. § 1983 because of the actions of three officials, Kontout, Korowotny and Lustig, who allegedly acted on behalf of the town. The third count of the amended complaint is against the town and alleges an unconstitutional taking under the federal constitution; the fourth count alleges an unconstitutional taking under the state constitution. The town has filed a motion for summary judgment. The rules to be applied with regard to the granting or denial of such motions are well known. It would appear that, in large part, the facts are not in dispute but rather that this motion must be decided based on disputed positions as to the law.

I.
(A)

The defendant town has moved for summary judgment as to all counts against it on several grounds, one of which is that the claims made are barred by application of the three-year statute of limitations, § 52-577 of the General Statutes. The town alleges that statute applies to a § 1983 action

since Congress did not enact its own statute. *Lownsbury v. Jeffries,* 25 F.2d 131, 133 (CA 2, 1994). Section 52-577 is a general or residual personal injury statute and thus should apply to claims made pursuant to 42 U.S.C. § 18. The defendant town argues that Kontout was the sanitarian for the Pomeraug Health District. Lustig was its health director. Korowotny was the only town official alluded to in the complaint and the last action he took--the issuance of the stop work order--occurred May 28, 1991, as noted, suit was not brought until October 1995. Both sides agree that in fact § 52-577 does apply. [FN1]

> FN1. Limitations claims are usually resolved by an examination of the pleadings. The issue of whether Kontout and Lustig are town employees is discussed later in this decision and will not be addressed here insofar as it bears on the statute of limitations issue.

To determine the operation or the appropriate application of a limitations statute, it must by definition first be determined when the particular cause of action accrued. As far as a § 1983 action is concerned, although the state limitations statute applies, the question of accrual is properly a federal question under the supremacy clause of the federal constitution since the definition of the accrual of the action goes to the substantive nature of the federal claim; the federal cases so hold. *Cornwell v. Robinson,* 23 F.3d 694, 703 (C.A.2, 1994). Such a claim accrues once the "plaintiff knows or has reason to know of the injury which is the basis of his (sic) action." *Singleton v. New York,* 632 F.2d 185, 191 (C.A.2, 1980). Ascertaining the implications of that phrase requires an examination of the "injury" claimed. Paragraph 13 of the third count (§ 1983 claim) in effect alleges a "taking" of the property--the plaintiff alleges she was "deprived of any practical, beneficial or economic use of the subject property without the payment of compensation." If we keep in mind what the *Singleton* case is just quoted to have said, it can

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

The defendant town has moved for summary judgment as to all counts against it on several grounds, one of which is that the claims made are barred by application of the three-year statute of limitations, § 52-577 of the General Statutes. The town alleges that statute applies to a § 1983 action

of the "injury" claimed. Paragraph 13 of the third count (§ 1983 claim) in effect alleges a "taking" of the property--the plaintiff alleges she was "deprived of any practical, beneficial or economic use of the subject property without the payment of compensation." If we keep in mind what the *Singleton* case is just quoted to have said, it can

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

of the "injury" claimed. Paragraph 13 of the third

Not Reported in A.2d                                                                                    Page 2
21 Conn. L. Rptr. 14
(Cite as: 1997 WL 707106 (Conn.Super.))

become quite confusing because another line of federal authority clearly states that the doctrine of exhaustion of administrative remedies does not apply to § 1983 claims. *Patsy v. Board of Regents,* 457 U.S. 496, 501, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1981); *Laurel Park, Inc. v. Pac,* 194 Conn. 677, 690, 485 A.2d 1272 (1984). If this is read along with *Singleton,* the federal courts could become inundated with "taking" cases broadly defined. So what the Supreme Court did in *Williamson Planning Commission v. Hamilton Bank,* 473 U.S. 172, 186-97, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1984) and *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc.,* 452 U.S. 264, 297 (1981), is to narrow the definition of "taking." Thus, at 473 U.S. page 187, commenting on *Hodel,* the *Hamilton Bank* court said that the court "rejected a claim that (a federal act) effected a taking because there was no indication that the party claiming to be aggrieved availed themselves of an opportunity to obtain administrative relief." Or to put it another way, a taking claim is not ripe for review until the government agency charged with enforcing the regulations had made a final decision. The benefit of this is that, as the court says at 452 U.S. at page 297, "a mutually acceptable solution might well be reached with regard to individual properties, thereby obviating any need to address the constitutional questions."

*2 What all this necessarily means is that, for all practical purposes, a taking claim is not ripe for review, hasn't accrued and cannot be prosecuted as a § 1983 action until an application to review the objected to action has been filed and finally processed--therefore the statute of limitations cannot run until all those events have transpired, cf. *Norco Construction, Inc. v. King County,* 801 F.2d 1143, 1145 (C.A.9, 1986). Here it appears that the plaintiff claims her rights were violated by the revocation on May 28, 1991 of her right to use an existing cesspool on the subject property. It is further claimed that Kontout and Lustig participated in disapproving of other plans for an alternate septic system which did not conclude until the State Health Department rejected the plaintiff's appeal in November 24, 1994. The latter date is well within the ambit of § 52-577 since suit was commenced in October 1995. [FN2] The court concludes the § 1983 action is not barred by the limitations statute.

FN2. There is no claim made here that the application to have the May 28, 1991 revocation reviewed and overturned was and should have been perceived as a useless act. *Herrington v. County of Sonoma,* 857 F.2d 567, 570 (C.A.9, 1988).

Thus, for the purposes of determining accrual of the cause of action, making the May 28, 1991 date operative instead of the November 24, 1994 date.

(B)

The claims under the state and federal constitution are inverse condemnation or taking cases and both sides agree that § 52-577 is the appropriate limitations statute to apply to these claims. Although the cases apparently fall into a different analytical pigeon hole, the just concluded reasoning would indicate there is no limitations problem as to these claims, either. The point is that a taking claim does not accrue until it is established that it is unlikely that no applications for use of the property will be approved and there is no meaningful use allowed for the property due to the regulations imposed. *Agins v. Tiburon,* 447 U.S. 255, 260-63, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980); *Cioffeletti v. Planning & Zoning Commission,* 220 Conn. 362, 371, 599 A.2d 9 (1991). Here that cannot be said until the plaintiff's appeal was denied in November of 1994.

The court denies the statute of limitations defense as to the counts against the town but does not address or base its decision on the plaintiff's reliance on the continuing nature of the claimed wrongs as a means to avoid the operation of the statute.

(II)

The town has also filed a motion for summary judgment as to the 42 U.S.C. § 1983 claims made against it. A purely legal claim is made; the town argues that the plaintiff asserts her rights were violated through the acts or omissions of an employee Korowotny and two people the town clerk claims are non-employees, Kontout and Lustig. The town argues that "it is well established that there is no vicarious liability under 42 U.S.C. § 1983 ." See *Monell v. N.Y. City Dept. of Social Services,*

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d                                                                 Page 3
21 Conn. L. Rptr. 14
**(Cite as: 1997 WL 707106 (Conn.Super.))**

U.S. 658, 694 (1978), p. 6 of 6/4/97 brief. The defendant town argues also that, in any event, the town cannot be held responsible pursuant to a § 1983 action for Kontout's and Lustig's activities since they were not town employees. The court will deal first with the *Monell* claim.

**\*3** The language of *Monell* must be examined carefully. The court said that "a municipality cannot be held liable *solely* because it employs a tortfeasor." *Id.*, p. 691. "Instead it is when execution of a government's policy or custom, whether made by the lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts injury that the government, as an entity, is responsible under § 1983." *Id.* p. 694. Later cases repeat this "municipal custom or policy" theme. See *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (C.A.2, 1996). The distinction between "policy" and "custom" was defined in *Board of County Commissioners of Bryan County, Okla. v. Brown*, 520 U.S. 397, ----, 117 S.Ct. 1382, 1388, 137 L.Ed.2d 626 where the court said: "Locating a 'policy' ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality ... Similarly, an act performed pursuant to a 'custom' that has not been formally approved by an appropriate decision maker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law."

The court has refined this generalization over the years to mean that a § 1983 violation need not be based on the act of, for example, a municipal legislative body but the court has "assumed that an unconstitutional governmental policy could be inferred from a single decision taken by the highest officials responsible for setting policy in that area of the government's business." *St. Louis v. Proprotnik*, 485 U.S. 112, 123, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988). The court said in *Brown* that: "To the extent that we have recognized a cause of action under § 1983 based on a single decision attributable to a municipality, we have done so only where the evidence that the municipality had acted and that the plaintiff had suffered a deprivation of federal rights also proved fault and causation." 520 U.S. at p. ----, 117 S.Ct. at p. 1389, citing *Owens v. Independence*, 445 U.S. 622, 100 S.Ct. 1398, 63

L.Ed.2d 673 (1980) and *Pembaur v. Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). On the other hand, the court recognized that "the identification of policy making officials is a question of state law." *Praprotnik* at page 124.

As noted, the town also makes the argument that Kontout and Lustig were not town employees. Clearly, if they were not town employees the town is not liable under § 1983 apart from the necessity of conducting a *Monell* analysis which deals with the issue of municipal vicarious liability for acts of its employees.

**\*4** The court will apply these principles in the following discussion of the claims and facts of this case.

The court finds the summary judgment motion cannot be granted for several reasons. The affidavit of the first selectman states Kontout and Lustig are not town employees but they are listed as such in the registrar published by the Secretary of the State. Besides the Public Health District for whom these individuals undisputably work is formed and operated by directors appointed by towns within the district, the towns pay a proportionate share of district expenses and the directors of health exercise all the authority as to public health required of or conferred upon constituent municipalities. §§ 19-241, 19- 243. A city's lawful policy maker cannot insulate a municipality from liability simply by delegating their policy making authority. The court has no idea about what the voting structure of the health district is, how many towns are involved or how much involvement the towns through their own officials maintain in the day to day operation of the Health District. All of this raises issues of fact or, if it is an issue of law, enough subsidiary facts have not been presented to resolve it.

The defendant town makes the further argument at page 9 of its brief that, even if Kontout and Lustig were to be considered town employees, no official policy of the town has been identified as having deprived the plaintiff of her constitutional rights. The only policy which has restricted the plaintiff in her use of the property is the Public Health Code which is a state law. Thus, Lustig and Kontout are agents of the state. [FN3] That is, these two individuals, even if they could be defined as town

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d                                                                    Page 4
21 Conn. L. Rptr. 14
**(Cite as: 1997 WL 707106 (Conn.Super.))**

officials, were not enforcing a policy of the town but of the state and a municipality can be held liable under § 1983 only when execution of a municipal policy or custom, whether made by its lawmakers or by acts that may fairly be said to represent municipal policy, inflicts the claimed injury. See *Monell* at 436 U.S. page 694. At oral argument the defendant town argued to permit this action would be akin to suing a town under *Monell* theory for enforcing the state penal code or federal statutory law.

> FN3. The same argument could be made as to Korowotny insofar as it is claimed that he was enforcing the state health code.

This is an interesting argument but the court believes it may miss the point of the plaintiff's claim. The plaintiff is not making an attack on the facial constitutionality of the State Health Code. She claims the Health Code *as applied by* town agents to her property results in a deprivation of her constitutional rights in that it deprives her totally of the economic use and benefit of her property. The court has already determined the status of Lustig and Kontout as municipal agents is a question of fact--it is also clear they had ultimate authority to act within their sphere of responsibility. If that issue is a question of fact that cannot be decided by the motion, the defendant cannot prevail on the present argument no matter how well drafted it is.
In other words, if in fact Lustig and Kontout are town employees or agents for § 1983 purposes how can the court say the *Brown* test under *Monell* may not be met which says that liability can be imposed for a single decision attributable to a municipality where "the evidence that the municipality had acted and the plaintiff suffered a deprivation of federal rights also proved fault and causation." 520 U.S. at p. ----, 117 S.Ct. at p. 1389. That's what the plaintiff alleges here. To accept the defendant's argument would immunize towns from § 1983 liability when the claim goes to how or the manner in which they enforced state law not necessarily that they were enforcing state law. Or to put it another way, municipal officials have an obligation to enforce and comply with the provisions and protections of the federal constitution which operates at all times and applies whether they are enforcing town or state law; state law has to be

applied and must be limited in its application by the dictates of federal constitutional requirements which town officials--if they are such--have a duty to obey independent of their duty to enforce particular state law. That window of opportunity provides the opportunity for a § 1983 action even though town officials purport to enforce a state law on health code. In effect, issues of fact prevent the granting of the summary judgment motion against this count.

(III)

*5 In the fourth count of the amended complaint, the plaintiff makes a claim under Article First § 11 of the state constitution asserting that there has been an inverse condemnation in that, as a result of the action of town officials, no reasonable use of the property is allowed.

The defendant town has moved for summary judgment. It relies on *Kelley Property Development, Inc. v. Lebanon,* 225 Conn. 314, 623 A.2d 470 (1993) which refused to recognize a damage remedy for people whose state constitutional due process rights under Article First § 8 of the state constitution have allegedly been violated by zoning officials. In *Kelley* the plaintiff developer sought damages for injuries sustained by a denial of a subdivision application. In language that can perhaps be construed as qualifying the broad assertion that no claim may be made under the state constitution, the court said: "As a general matter, we should not construe our state constitution to provide a basis for the recognition of a private damages action for injuries for which the legislature has provided a reasonably adequate statutory remedy." *Id.* page 339, 623 A.2d 470. In *Kelley* the court noted that the plaintiff could have appealed the action of the officials under § 8-8 of the General Statutes and he could have pursued other remedies such as an action for intentional interference with business expectancy or for equitable relief. A *Bivens* type action would run the risk of imposing enormous financial costs on zoning commissioners who are laypersons, encourage suits whenever zoning applications are denied and might have a chilling effect on the zeal with which these local officials enforce the zoning laws. *Id.,* pp. 341-42. See also *Czap v. Town of Newtown,* 18 CONN. L. RPTR. 463, '96 Super. Lexis 3334 at 5.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d                                                    Page 5
21 Conn. L. Rptr. 14
**(Cite as: 1997 WL 707106 (Conn.Super.))**

The defendant argues that here there are adequate remedies; the plaintiff can and has sued town officials for negligent misrepresentation and breach of contract and appealed the actions of Kontout to the Department of Public Health and Addiction Services pursuant to statute.

The plaintiff does not dispute this law but notes that in our state a property owner can recover damages where the state or city engages in conduct which amounts to a taking. *Textron, Inc. v. Wood,* 167 Conn. 334, 344, 355 A.2d 307 (1974). Article First § 11 of our constitution provides that: "The property of no person shall be taken for public use, without just compensation therefor." It is also clear that a taking can occur without actual physical appropriation of the land but where there is an interference with its use that in effect nullifies the value of the property or substantially abridges its enjoyment. See *Wood* at 167 Conn. p. 346, 355 A.2d 307; also see *Brecciaroli v. Commissioner of Environmental Protection,* 168 Conn. 349, 355, 362 A.2d 948 (1975). Connecticut also appears to recognize the right to recover damages for a temporary taking of property. *Town of Trumbull v. Ehrsam,* 148 Conn. 47, 50, 55, 166 A.2d 844 (1961)

**\*6** Based on this characterization of the plaintiff's claim and having been presented with no factual claim supported by affidavits or other documents that a "taking" as asserted by the plaintiff did not occur, the court will deny the summary judgment motion as to the fifth count.

### (IV)

The defendant town also relies on the immunity provisions of §§ 52- 557n(b)(7) and (8) of the General Statutes. It is clear that this defense does not apply to the federal § 1983 claim--state grants of immunity cannot limit federal rights. *Martinez v. California,* 444 U.S. 277, 284, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980).

But town argues that this statutory defense applies to the plaintiff's claim under the state constitution. However, the immunity provisions in subsection (b) of § 52-577(n) apply only in this context of actions referred to in subsection (a) of the statute. None of the actions described in subsection (a) involve a "taking" claim under the state constitution. Query

whether the state legislature can create immunity defenses to taking claims under Article First, § 11 of the state constitution when it does not explicitly reference the article or purport to create the particular immunities in order, for example, to expedite the handling of taking claims in general or allow for their more efficient and fair resolution. The state cannot even assert a sovereign immunity against an Article First § 11 claim. *Textron, Inc. v. Wood,* 167 Conn. at 342-43, 355 A.2d 307, how can the state legislature concoct statutory immunity so that municipalities can avoid damage claims for takings claimed to be violative of the constitutional provision?

The court does not accept this statutory immunity defense as a vehicle to preclude the plaintiff's claim under the state constitution.

1997 WL 707106 (Conn.Super.), 21 Conn. L. Rptr. 14

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Westlaw.

Not Reported in A.2d                                                    Page 1
(Cite as: 1998 WL 661445 (Conn.Super.))

**H**
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.


Superior Court of Connecticut.

Barbara BLACKBURN
v.
MILLER-STEPHENSON CHEMICAL CO., INC.

**No. CV 930314089.**

Sept. 11, 1998.


Memorandum of Decision

LEHENY, J.

*1 The plaintiff, Barbara Blackburn, brought this
action made returnable to the court on July 20,
1993. She alleged that the defendant,
Miller-Stephenson Chemical Company, Inc., caused
soil and water contamination on property she owns
at 42 and 44 Backus Avenue, Danbury thereby
causing her damages. The first count of the
plaintiff's amended complaint alleges that the
defendant negligently discharged volatile organic
compounds into the environment. The second count
alleges a cause of action in negligence pursuant to §
§ 22a- 427, 22a-430 and 22a-454 of the General
Statutes. The third count alleges that the defendant
created a nuisance because its discharge of volatile
organic compounds migrated through the
groundwater to the plaintiff's property and well. The
fourth count lies in trespass in that the plaintiff
alleges that the migration of the contaminants was a
physical invasion of her property. The fifth count
claims reimbursement for remediation or clean-up
costs pursuant to § 22a-452 of the General Statutes.
In the sixth count, the plaintiff seeks declaratory
and equitable relief for the protection of the public
trust in the air, water and natural resources from

unreasonable pollution, alleging that the defendant
impaired or destroyed the public trust in these
resources pursuant to General Statutes § 22a-16.

The plaintiff claims the following relief:
   1. money damages, in the amount of present
   and/or permanent diminution of the market value
   of plaintiff's property;
   2. money damages for plaintiff's present and
   future loss of rental income;
   3. money damages, multiple damages where
   appropriate, and/or an order requiring defendant
   to reimburse plaintiff for all costs incurred or to
   be incurred for investigation, removal, and other
   mitigation of the contamination of plaintiff's
   property;
   4. Legal expenses and court costs incurred in the
   recovery of plaintiff's costs for investigating,
   containing, removing, monitoring or mitigating
   the pollution and contamination of plaintiff's
   property;
   5. An order requiring defendant to remediate all
   environmental contamination present at plaintiff's
   property;
   6. Such other and further relief as the court deems
   just and equitable.

In a subsequent amendment to the first amended
complaint, the plaintiff seeks the following relief:
   7. An order requiring the defendant to indemnify
   her for any costs or expenses she may be
   subjected to as a result of defendant's
   contamination of the property;
   8. Damages for aggravation and worry.

The court took evidence on three days commencing
September 23, 1997. Thereafter, the parties
exchanged briefs. The parties agreed that, if the
court were to determine that attorneys fees and costs
were to be awarded, a separate evidentiary hearing
would be held.

The defendant raises the following special
defenses: that the plaintiff failed to state a claim
upon which relief may be granted; that the plaintiff
failed to mitigate her damages; her claims are
barred by the applicable statute of limitations;
damages were caused by a supervising, intervening

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d                                                              Page 2
(Cite as: 1998 WL 661445 (Conn.Super.))

cause; her own negligence was greater than the defendant's negligence; that her recovery should be diminished pursuant to § 52-572h of the General Statutes; that the actions of third parties caused the harm; that the plaintiff's costs were unreasonable and therefore not recoverable; her claims are barred by the doctrines of laches, waiver, unclean hands and equitable estoppel.

*2 Because the special defense alleging that the plaintiff's claims are time-barred is dispositive of certain counts, the court addresses that issue first.

FIRST AND SECOND COUNTS

General Statutes § 52-577c [FN1] is the applicable statute of limitations for personal injury or property damages caused by exposure to a hazardous pollutant, "whether based on negligence or some other theory." *Goldblum v. The Pittson Co.,* Superior Court, judicial district of Stamford-Norwalk at Stamford, Docket No. 126252 (April 24, 1996) (Stevens, J.) (16 C ONN. L. R PTR. 512); *Millbrook Owner's Association v. Hamilton Std.,* Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 556416 (June 11, 1996) (Hennessy, J.) (17 CONN. L. RPTR. 178). The legislative history of § 52-577c indicates that the purpose of this statute "was to extend the statute of limitations for suits to recover damages caused by toxic waste pollution." *Goldblum v. The Pittson Co., supra,* 16 CONN. L. RPTR. 512.

> FN1. General Statutes § 52-577c reads in relevant part: (b)Notwithstanding the provisions of sections 52-577 and 52-577a, no action to recover damages for personal injury or property damage caused by exposure to a hazardous chemical substance or mixture or hazardous pollutant released into the environment shall be brought but within two years from the date when the injury or damage complained of is discovered or in the exercise of reasonable care should have been discovered.

The statute begins the limitation period "when the injury or damage complained of is discovered or in the exercise of reasonable care should have been

discovered." The plaintiff claims that the limitations period did not begin until she had actual notice of the contamination in 1993. The defendant claims the period began when she acquired the property in 1991 because the DEP cleanup order was a matter of public record at that time and had she adhered to standards of commercial real estate transactions, she would have discovered the problem then. "Reasonable care" is not defined in § 52-577c. The plaintiff claims to have been an "innocent landowner" as defined in § 22a-452d [FN2] at the time she acquired the property to support her claim that she did not know or have reason to know that the property was contaminated. In *Starr v. Commissioner of Environmental Protection,* 236 Conn. 722, 675 A.2d 430 (1996), the court, interpreting § 22a-452(B)(iv), which provides a defense to "one who acquires property through inheritance or bequest," said that the subsection was "intended to protect people who involuntarily thrust upon them." *Id.,* 738, 675 A.2d 430. This case does not help her position, however, because her acquisition of the property in a divorce settlement cannot realistically be characterized as having the ownership thrust upon her.

> FN2. Section 22a-452d provides a defense against a claim for indemnification for cleanup costs to owners who acquire polluted property without knowledge of the pollution. It provides immunity to four classes of persons, if "at the time of acquisition, the person (i) does not know and has no reason to know of the spill or discharge, and inquires, consistent with good commercial or customary practices, into the previous uses of the property; (ii) is a government entity; (iii) acquires the interest in real estate by inheritance or bequest; or (iv) acquires the interest in real estate as an executor or administrator of a decedent's estate." § 22a- 452d(B).

Rather, it is subsection (B)(i) that provides the standard most applicable to her situation. This subsection protects from liability a landowner who "does not know and has no reason to know of the spill or discharge, and inquires, consistent with good commercial or customary practices, into the previous uses of the property." It does not require

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d
(Cite as: 1998 WL 661445 (Conn.Super.))

Page 3

that every acquisition of property conform to commercial standards, only to "customary practices," which would depend on the particular scenario. In interpreting similar language in CERCLA (Comprehensive Environmental Response, Compensation & Liability Act of 1980), 42 U.S.C. § 9601 et seq., the district court in *U.S. v. Pacific Hide & Fur Depot, Inc.,* 716 F.Supp. 1341 (D.Idaho 1989), noted that Congress created a three-tier standard for commercial transactions, private transactions, and inheritances and bequests, and what constitutes a reasonable inquiry in a private transaction is a factual question. *Id.,* 1348. To qualify under the CERCLA standard, "the defendant must have undertaken, at the time of acquisition, all appropriate inquiry into the previous ownership and uses of the property consistent with good commercial or customary practice in an effort to minimize liability. For purposes of the preceding sentence the court shall take into account any specialized knowledge or experience on the part of the defendant, the relationship of the purchase price to the value of the property if uncontaminated, commonly known or reasonably ascertainable information about the property, the obviousness of the presence or likely presence of contamination of the property, and the ability to detect such contamination by appropriate inspection." 42 U.S.C. § 9601(35)(B); *U.S. v. Pacific Hide & Fur Depot, Inc., supra,* 716 F.Sup. 1347.

*3 With the analogous standard of an "innocent landowner" in mind, the court looks to the particular facts of the plaintiff's situation to determine what a reasonable inquiry would have been at the time she acquired this property.

The court finds the following facts. The plaintiff, Barbara Blackburn, owns 3.6 acres of land located at 42 and 44 Backus Avenue, Danbury. She obtained this property on May 24, 1991 in settlement of a bitter marital dissolution action between her and George Valluzzo.

There is a building on the property with an apartment on the second floor and a small business on the lower floor. During the 1960s in the early years of her marriage, Blackburn lived at 42 Backus Avenue.

At the time of the dissolution, Valluzzo was president, or at least an officer of Danbury Centerless Grinding, now DCG Precision

Manufacturing, a business he operated through most, if not all, of the marriage. Blackburn had no connection with her husband's business. Her husband did not share his work or business activities with her. She did not work in the business for compensation or otherwise at any time. She had not visited the property for at least 10 years prior to owning it. However, she knew in general that manufacturing operations were going on in the larger building before 1991, but had no first hand knowledge of what the operations were.

At the time of the divorce settlement, Blackburn was represented by counsel. She agreed to take the Backus Avenue property which Valluzzo had listed for sale at an asking price of $700,000.00. She did not visit the property before she accepted it despite knowing that her husband had operated a machine shop there. In 1988 she obtained an appraisal limited to the estimated fair market value of the property. Since the dissolution was contentious, it is unclear why she accepted Valluzzo's representation that he had not filled in any wetlands or buried hazardous materials on the property. In 1991 she neglected to have the appraisal updated and to reconcile the difference of $150,000 between the appraised value and her husband's asking price. She failed to do a "phase one" investigation which would have included visiting the site, noting what was on it, what type of chemicals or compounds the machine shop had used, the source and condition of the water supply, the direction of ground water flow, and the state of the septic system. She did not learn that, in 1988, the Connecticut Department of Environmental Protection (DEP) detected the presence of contaminants in a well on the property. She obtained a title insurance policy; a title search, if any, did not reveal notice of local health code violations pertaining to contamination of the well water at 44 Backus Avenue. While taking these steps would have indicated contamination only on her property, they might have led to the discovery that the source of certain contaminants was the Miller-Stephenson property.

After taking title to the property, Blackburn went to the property primarily to meet with the tenant, and to enter into an oral lease with him. She found clutter and debris around and inside the building. She took no steps to clean up the property except to remove an oil tank. It is also unclear as to what discussions, if any, Blackburn had with the broker who listed the property in 1991 about the process

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d
(Cite as: 1998 WL 661445 (Conn.Super.))

utilized when a buyer seeks to purchase industrial property. At that time Michael Ryer had been a commercial real estate and sales person for approximately eighteen years and handled ninety to ninety-five commercial properties at any given time. He was aware that the purchase of industrial property requires environmental studies in order to obtain financing and title insurance, and that a "phase one" investigation is routine where the proposed transaction involves property where manufacturing occurred. Ryer thought the asking price of $700,000 too high. Blackburn did not reduce the price in view of the cost of a phase one to a prospective buyer. She chose not to discover what a phase one investigation might reveal nor its ramifications to her when she sold the property. The asking price remained $700,000 until shortly before trial when it was reduced to $550,000. An offer to purchase the property at that price was made but no binder signed.

*4 On July 7, 1992 the DEP informed Blackburn's tenants, Mr. and Mrs. Whitlock who resided at 44 Backus Avenue, that benzene had been detected in their drinking water supply. They were instructed to use bottled water. In April 1993 the DEP sent Blackburn a letter regarding the presence of benzene in the drinking water of 44 Backus Avenue. The premises were supplied with bottled water by the state and the defendant. In September 1993 the premises were hooked up to the public water supply. Meanwhile, Blackburn had conversations with HRP who stated that soil venting on her property would clean up the contamination. When Whitlock moved, and Blackburn began to recognize the seriousness of her position, she contacted counsel and sought legal remedies.

The court finds that Blackburn did not act reasonably in 1991. She knew the historical use of the property. The fact that she obtained the property through negotiations in a divorce settlement did not lessen her burden to seek out information affecting the value of the asset.

For the foregoing reasons the court finds that the plaintiff did not bring this action within the time provided by General Statutes §§ 52-577c. Therefore, the first and second counts sounding in common law and statutory negligence are barred by the statute of limitations.

THIRD AND FOURTH COUNTS

The third and fourth count, in nuisance and trespass respectively, are not barred by the statute of limitations because they are continuing.

The four elements of a private nuisance are: "(1) the condition complained of had a natural tendency to create danger and inflict injury upon person or property; (2) the danger created was a continuing one; (3) the use of the land was unreasonable or unlawful; (4) the existence of the nuisance was the proximate cause of the plaintiff's injuries and damages." *Filisko v. Bridgeport Hydraulic Co.,* 176 Conn. 33, 35-36, 404 A.2d 889 (1978). A distinction is usually observed between permanent and temporary nuisances. "The character of a nuisance as permanent or temporary [and therefore abatable] does not impinge on the proof of the basic cause of action: whether the land use by the defendant amounts to an invasion of a legal right of the plaintiff. It determines whether the nuisance, as proven, gives rise to a single cause of action or successive causes of action. It determines, therefore, the rule for the measurement of the damages." (Brackets in original.) *Fletcher v. City of Independence,* 708 S.W.2d 158, 178 (Mo.App.1986).

"A permanent nuisance has been said to be one which inflicts a permanent injury upon real estate; the proper measure of damages is the depreciation in the value of the property ... A temporary nuisance is one where there is but temporary interference with the use and enjoyment of property; the appropriate measure of damages is the temporary reduction in rental value, not depreciation in market value. (Citations omitted.) *Filisko v. Bridgeport Hydraulic Co., supra,* 176 Conn. 40. "[W]here one builds or maintains upon his land a structure which creates a permanent nuisance upon the lands of another to his injury ... the latter is entitled to recover once for all damages for the injury, measured by the resulting depreciation in the value of the property." *Southern New England Ice Co. v. West Hartford,* 114 Conn. 496, 507-08, 159 A. 470 (1932). A temporary, or continuing, nuisance has "traditionally been considered suitable grounds for equitable relief." *Tomasso Bros., Inc. v. October Twenty-Four Inc.,* 230 Conn. 641, 649, 646 A.2d 133 (1994). See also *Stratford Theater, Inc. v. Stratford,* 140 Conn. 422, 425, 101 A.2d 279 (1953) (measure of damages for temporary damages is cost to remedy the nuisance).

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d                                                                          Page 5
(Cite as: 1998 WL 661445 (Conn.Super.))

*5 Whether a nuisance is permanent or temporary is also relevant for purposes of the statute of limitations and the rights of a successor in interest to maintain a nuisance action. *Fletcher v. City of Independence, supra,* 708 S.W.2d 178 n. 5. "In nuisance actions it is important, for statute of limitations purposes, to ascertain whether the invasion or interference is 'permanent' or 'continuous.' " *Beatty v. Washington Metro. Area Transit Auth.,* 860 F.2d 1117, 1122 (D.C.Cir.1988). "If the injury or wrong is classified as temporary, the limitation period starts to run only when the plaintiff's land or crops are actually harmed, and for purposes of the statute of limitations, each injury causes a new cause of action to accrue, at least until the injury becomes permanent ... This rule is especially applicable if the situation involves elements of uncertainty, such as the possibility or likelihood of the alteration or abatement of the causative condition ... The rule is predicated upon the defendant's ability and duty to abate the existing conditions which constitute the nuisance." (Citations omitted; internal quotation marks omitted.) *Miller v. Cudahy,* 858 F.2d 1449, 1453 (10th Cir.), cert. denied, 492 U.S. 926, 109 S.Ct. 3265, 106 L.Ed.2d 610 (1988).

The characterization of a nuisance is not necessarily dependent on whether the conduct that caused the nuisance has ceased. "[T]he life of an absolute nuisance exists as long as the nuisance lasts. When one creates such a nuisance is of no moment. As long as it exists, each instant of its continuance makes its creator liable for the injuries it occasions." *Gryboski v. Tomasso,* 11 Conn.Supp. 239, 241 (1942). See also *Sundell v. Town of New London,* 119 N.H. 839, 409 A.2d 1315, 1320 (N.H.1979) (nuisance is abatable even if injuries continue after causative acts cease). "Courts consider not only the permanent or temporary nature of the damages, but also the permanent or temporary nature of the causative factor, so 'each case must be considered in its own factual setting.' " *Miller v. Cudahy, supra,* 858 F.2d 1453. "Whether a nuisance is temporary or permanent is ordinarily a question of fact." *Filisko v. Bridereport Hydraulic Co., supra,* 176 Conn. 40. See also *Mangini v. Aerojet- General Corp.,* 230 Cal.App.3d 1125, 281 Cal.Rptr. 827, 841 (1991) ("Whether contamination by toxic waste is a permanent or continuing injury is ordinarily a question of fact turning on the nature and extent of the contamination").

In order to recover on a common law trespass action, a plaintiff must show "ownership or possessory interest in property; the physical invasion, entry or intrusion by defendant which affects the plaintiff's possessory rights; intent to do that which causes the invasion and a direct injury to the plaintiff's property." *Caltabiano v. Jimmo,* Superior Court judicial district of Middlesex, Docket No. 67609 (May 5, 1995) (Higgins, J.), quoting *Avery v. Spicer,* 90 Conn. 576, 579, 98 A. 135 (1916). "An action for damages for trespass is a possessory action ... for which title is only incidentally relevant ... When an injunction is sought to restrain a trespass, however, title is an essential element in a plaintiff's case ... Consequently, where both damages for trespass and an injunction are sought, both title to and possession of the disputed area must be proved." (Citations omitted.) *McCullough v. Waterfront Park Assn., Inc.,* 32 Conn.App. 746, 749, 630 A.2d 1372, cert. denied, 227 Conn. 933, 632 A.2d 707 (1993).

*6 "[A] trespass may be committed on, beneath, or above the surface of the earth [and] the phrase 'surface of the earth' includes soil, water, trees, and other growths ... [A] trespass need not be inflicted directly on another's realty, but may be committed by discharging foreign polluting matter at a point beyond the boundary of such realty ... In order that there may be a trespass ... [i]t is enough that an act is done with knowledge that it will to a substantial certainty result in the entry of the foreign matter [on the property]." (Citations omitted; internal quotation marks omitted.) *Ahnert v. Getty,* Superior Court, judicial district of New London, Docket No. 537008 (April 4, 1997) (Handy, J.).

"Generally, [a] statute which establishes a limitations period in an action for trespass to real property commences running at the occurrence of the first actual damages. The statute runs, in the case of a trespass or physical invasion of the surface of another's land, from the time of the unlawful entry ... However, [w]here a trespass is a continuing one, and not of that class of permanent appropriations to be assessed for all time at once, there may be successive actions for each continuance of the trespass ... A continuing trespass upon real property creates separate causes of action, which are barred only by the running of the statute against the successive trespasses, and not by the running of the statute from the time of the original trespass." (Citations omitted; internal quotation

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d
(Cite as: 1998 WL 661445 (Conn.Super.))

marks omitted.) *Prescott v. Northeast Utilities,* Superior Court, judicial district of Fairfield at Bridgeport, Docket No. 315423, 15 CONN. L. RPTR. 489 (December 18, 1995) (Ballen, J.).

"Injunctions are liberally granted in cases of continuing trespass." *Pender v. Matranga,* Superior Court, judicial district of Danbury, Docket No. 319129 (August 9, 1995) (Riefberg, J.). "[I]n determining whether to grant injunctive relief, a more liberal rule is followed in cases of a permanent or continuing nuisance, such as a trespass." (Internal quotation marks omitted.) *Walton v. New Hartford,* 223 Conn. 155, 166, 612 A.2d 1153 (1992).

Relevant to the claims of continuing nuisance and trespass the court finds the following facts proven. At all relevant times, the defendant, Miller-Stephenson, has been in the business of receiving chemicals in large quantities, blending and packaging them into smaller units and distributing them for industrial use. The business was started in Norwalk in 1955 by George Stephenson, a chemical engineer. It moved to its present location on Backus Avenue in Danbury in 1972. Stephenson purchased the site from a bankrupt pharmaceutical firm. Although there were several storage drums on the property at that time, he made no effort to determine if there was spillage from these drums and had them removed. He knew that the parking lot was stained but made no effort to determine the source of the stains. Instead, despite his expertise in the field of chemicals, he had it rebuilt and repaved without inquiring as to the source of the stains. He made no investigation regarding environmental conditions that existed on the property at the time of his purchase. In 1972 he repackaged epoxy resins and handled aerosols manufactured for him in Illinois. These aerosols were produced for the electronics and plastics industries and consisted of degreasing agents and circuit-board cleaners. Stephenson's business expanded, from purchasing resins and aerosols produced off-site to include production of aerosols on-site. Among the chemicals the company used were 1,1,1-trichloroethane (TCA) and freons which were detected in Blackburn's well. The DEP subsequently found other chemical waste on the site including some chemicals Stephenson did not use.

*7 Until 1986 waste products were stored in a warehouse because Stephenson did not have the staff or the motivation to dispose of the waste materials. (Exhibit 26, Stephenson deposition, p. 45.) They were disposed of after William Brennan was hired as purchasing manager in 1986. Brennan became operations manager shortly after being hired, a position he holds today. His responsibilities include environmental compliance although he had no specific training in environmental compliance before being hired. Before he arrived no contingency plan existed for dealing with problems arising from the use, storage or disposal of hazardous wastes and the company was not in compliance with regulations concerning storage or disposal of hazardous wastes. In 1986 there were four 5500 gallon tanks containing freon outside the building. Later drums outside the building contained TCA. Leaks that occurred fell on asphalt inside or outside the building during the process of transferring the chemical from the delivery truck to the tank. In April 1986, the DEP conducted an inspection at the Miller-Stephenson site and cited the company for violations of the Hazardous Waste Management Regulations and referred the matter to the Attorney General. The defendant removed various empty drums of contaminants, including freon. Thereafter, HRP Associates, a consulting firm, developed various documents, including a contingency plan, to assist the defendant in complying with the environmental laws.

In late 1987 the DEP found contaminants in septic sludge and chemical waste at the defendant's property. The DEP ordered Miller-Stephenson to "investigate the extent and degree of groundwater, surface water and soil contamination resulting from chemical storage, handling and disposal activities at 55 Backus Avenue." (Exhibit "O," binder I, section 18, Order No. WS 4661.) The DEP further directed the defendant to remediate, apply for discharge permits for discharges into the waters of the state and to implement a groundwater quality monitoring program. A timetable was established through July 31, 1989 for the accomplishment of these goals.

In January 1988, HRP began an investigation. HRP installed sub-surface borings and groundwater monitoring wells at the defendant's site and conducted tests. The laboratory results indicated the presence of TCA, 1,1- dichloroethane, (1,1 DCA) a breakdown product of TCA, benzene, 1,1-dichloroethylene, various forms of freon, and other contaminants. In addition, residential well samples taken on the Valluzzo (Blackburn) property

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d                                                                    Page 7
(Cite as: 1998 WL 661445 (Conn.Super.))

contained TCA and 1,1-dichloroethylene. By December 1989 the DEP was satisfied with the defendant's compliance with part of the order; in June, 1989 HRP submitted a hydrogeologic and engineering report to DEP. HRP recommended the following: that the contaminated soil be treated by soil venting; that the groundwater underlying the site be treated so as to strip the volatile organic chemicals which exceeded the state action levels; and (3) that four adjacent residences, including Blackburn's, be supplied with city water. The report estimated the cost of this remediation at $190,000 and estimated remediation could occur within six to nine months.

*8 The DEP reviewed the report and requested additional information. HRP supplied further reports. Miller-Stephenson appealed DEP Order WC 4661. These steps, as well as changes in DEP personnel reviewing the matter, resulted in long delays which have allowed this situation to continue for nearly a decade.

The state has defined certain locations as GA or GB areas for the purposes of specifying environmental criteria as to soil and water. The GA classification applies to residential areas where potable water is required and the criteria are more stringent; the GB classification applies to commercial or industrial areas. See Regs., Conn. State Agencies 22a-133k-1 et seq. The plaintiff's property lies in a GB groundwater classification area. This designation reflects the historical presence of contamination because of the property's use as a machine shop and its proximity to Danbury airport. The defendant's property lies in a GA groundwater classification area. The findings of pollutants on its property require groundwater remediation at the Miller- Stephenson site. Connecticut has also established criteria for soil: direct exposure criteria for soil in the upper four feet where health can be harmed through ingestion and inhalation, and pollutant mobility criteria which is concerned with the mobility of contaminants in the upper 15 feet of soil where the upper layer of groundwater takes on any contaminants in that layer of soil. In addition, Connecticut now has standards for surface water which regulates ground water discharge into a stream. In fairness to the defendant, it should be noted that some of these criteria did not exist before 1996.

The HRP 1993 report stated that the level of TCA

found on the Blackburn property did not exceed the state's surface water, ground water or volatilization criteria. However, the report demonstrated that TCA, 1,1- Dichloroethene (DCE,) benzene and chloroform, were found in some wells on the defendant's property to exceed the ground water protection criteria for the GA classification, as well as the surface water protection criteria and the volatilization criteria. These findings would require remediation on the Miller-Stephenson property.

In 1994 HRP documented the results of tests which indicated benzene in monitoring wells (MW) 1B and 1C on the Miller-Stephenson site exceeding the groundwater (GW) criteria level for the GA class; chloroform in MW 1B exceeding the GW criteria: DCA exceeding GW criteria in MW 1B; and TCA and DCE in MW 3 near the defendant's driveway up gradient of the Blackburn well. DCE was also present in excess of standards in MW 6B and 6C. These findings continued to demonstrate a need for remediation on Miller-Stephenson property. These levels are significant because MW 1A, 1B and 1C lie on the defendant's property boundary at Backus Avenue, directly across from, and up gradient to, the Blackburn property.

In 1996 and 1997 Leggette, Brashears and Graham, an environmental and ground water consulting firm, was retained by the plaintiff to perform tests on her well. The firm also collected water and sediment samples from a temporary stream on her property which is connected to a wetland. The levels of TCA, freons, DCE and DCA found in the water supply well decreased from 1996 to 1997. TCA and ethyl ether were found in the stream samples in 1996 and in a negligible amount in 1997. Chloroform and benzene found in the well in 1996 were below detectable limits in 1997. However, these results are dependent upon the levels of water in the well and stream and are inconclusive. Even the defendant's expert found that no trend was established with regard to the level of contamination. Except for ethyl ether, these compounds were found on the defendant's property in September 1993 in the monitoring wells closest to the Blackburn property and down gradient from the source of the Miller-Stephenson contamination.

*9 The defendant's expert, Walter Gancarz of HRP, agreed that the unremediated soil on the defendant's site could likely lead to further groundwater contamination. He conceded that the source of

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d
(Cite as: 1998 WL 661445 (Conn.Super.))

freons in the Blackburn well was the Miller-Stephenson site. The defendant argues that Blackburn's property was already contaminated from Valluzzo's activities and the proximity to Danbury airport. However, levels of TCA and freons were non- detectible in the drums Blackburn had removed from her property. (Exhibit K.) It is unlikely that TCA, DCA and DCE are from other sources. Since DCE and DCA are breakdown products of TCA, and since there is a high concentration of TCA on the defendant's site, it is more than likely that Miller-Stephenson is the source of those contaminants on the plaintiff's property. Both Gancarz and Buzea agreed that the plume of contamination from Miller-Stephenson could migrate to the Blackburn property for several years.

The DEP advised Miller-Stephenson to install interceptor wells along the line formed by MW 12, 13 and 14, closer to the source of the contamination. That proposal ignores remediation of any contamination existing between that line and Backus Avenue. The level of contamination will go undetected. Furthermore, a line of interceptor wells closer to the source will not remove contaminants from Miller-Stephenson's wells on Backus Avenue closest to Blackburn's property. Blackburn's property will still be the recipient of unwanted contaminants.

For the foregoing reasons, the court finds that the defendant is creating a nuisance and maintaining a continuing trespass of contaminants to an unknown extent on the plaintiff's property. What remains to be determined is the appropriate remedy.

FIFTH COUNT

The fifth count is brought pursuant to General Statutes § 22a-452. Section 22a-452(a) provides for reimbursement for contamination removal costs where the pollution or contamination resulted from "the negligence or other actions of such person, firm or corporation." In *Connecticut Resources Recovery Authority v. Refuse Gardens, Inc.,* 43 Conn.Supp. 83, 642 A.2d 762, aff'd. 229 Conn. 455, 642 A.2d 697 (1994), the court ruled that liability under § 22a-452(a) must "be based on culpability and not merely causation."

The question of which statute of limitations, § 52-577 or § 52-577c, applies to claims under §

22a-452 was first addressed in *Electroformers, Inc. v. Emhart Corp.,* Superior Court, judicial district of Danbury, Docket No. 297891 (January 29, 1993) (Fuller, J.) (8 CONN. L. RPTR. 307), in which the court concluded that § 52-577c would apply if the facts fit within that statute's definition of "damages caused by exposure to a hazardous substance." See also *Sharp v. Wyatt,* 31 Conn.App. 824, 854-55, 627 A.2d 1347, aff'd, 230 Conn. 12, 644 A.2d 871 (1994) (determining that the damages were not caused by "exposure" and applied § 52-577); *Doty v. Mucci,* 238 Conn. 800, 805, 679 A.2d 945 (1996) (damages caused by petroleum outside definition of hazardous pollutant); *Goldblum v. The Pittson Co., supra,* 16 CONN. L. RPTR. 512 (question of fact whether petroleum contaminant came under statute); *Millbrook Owner's Association v. Hamilton Std., supra,* 17 CONN. L. RPTR. 178 (applying § 52-577c because damages caused by hazardous chemicals). As this case involves damages to real property caused by exposure to hazardous substances, the two-year statute of limitations in § 52-577c(b) applies, and the claim in the fifth count is barred for the same reasons as in the first and second counts.

*10 In addition, the claim in the fifth count is insufficient to state a cause of action under the statute, because the plaintiff has not alleged or proven that she has expended any money for cleanup or mitigation.

"Although the reimbursement scheme established under § 22a-452 was not part of the CWPCA [Connecticut Water Pollution Control Act] as originally enacted, the provisions of § 22a-452 must be read in a manner consistent with the overriding remedial purpose of the CWPCA. Whereas the commissioner of environmental protection is empowered to supervise, administer and enforce the CWPCA; General Statutes § 22a-424; § 22a-452(a) broadly provides that any person, firm, corporation or municipality that contains, removes or otherwise mitigates the effects of contamination may seek reimbursement from any person, firm or corporation negligently responsible for such contamination. The clear purpose of this provision is to encourage parties to pay for remediation by providing them with an opportunity to recoup at least some of their remediation costs from others who are also found to be responsible for the contamination. *Knight v. F.L. Roberts and Co., Inc.,* 241 Conn. 466, 474-75, 696 A.2d 1249 (1997). In *Knight,* the plaintiff sought

Not Reported in A.2d                                                                                    Page 9
(Cite as: 1998 WL 661445 (Conn.Super.))

recovery for money expended in a settlement with an adjoining landowner for damages caused by conduct on the plaintiff's property. The plaintiff alleged that the defendants had been responsible for the damage by their use of underground gasoline storage tanks. The court held that the plaintiff did not have to have directly engaged in cleanup activities, but could seek reimbursement for having paid a claim for someone else's remediation efforts. "In light of the inclusive language of § 22a-452 and the broad remedial purpose of the statutory scheme of which it is a part, we conclude that the plaintiff is entitled to reimbursement from the defendants under § 22a-452(a) for their pro rata share of the costs of containing, removing or otherwise mitigating the contamination of CL & P's property *if, as the plaintiff has alleged, the defendants are also negligently responsible for contaminating that property, and CL & P used the $400,000 it received from the plaintiff to remediate the contamination.*" (Emphasis added.) *Id.*, 475-76, 696 A.2d 1249. In other words, the statute requires that the remediation has already taken place.

Other courts have held that a plaintiff seeking reimbursement under this statute must allege that he has taken action to remediate the alleged contamination of the property or that he has expended funds for such remediation. *Hartt v. Schwartz,* Superior Court, judicial district of New Haven, Docket No. 331912, 21 CONN. L. RPTR. 52 (December 3, 1997) (Blue, J.) (striking the count from a third-party complaint); *Albahary v. City & Town of Bristol, Conn.,* 963 F.Supp. 150, 156 (D.Conn.1997) ("by its terms, § 22a-452 allows reimbursement of remediation costs only if a plaintiffs has 'contain[ed] or remove[d] or otherwise mitigate[d]' contamination"); *Warner v. Kedah Corp.,* Superior Court, judicial district of Middletown, Docket No. 72964 (September 20, 1995) (Stanley, J.) (same); *Bristol Shopping Plaza v. Vigilante Cleaners,* Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 338958 (December 1, 1989) (Ripley, J.) (§ 22a-452 does not apply to actions for damages which may or may not be expended for cleanup purposes); *Connecticut Light & Power Co. v. Knight,* Superior Court, judicial district of Windham at Putnam, Docket No. 33646 (July 23, 1993) (Potter, J.) (party seeking reimbursement must undertake some action towards cleanup) but see *Hartt v. Schwartz,* 20 CONN. L. RPTR. 454, 460 (on a motion to strike a 22a-452 claim from the

first-party complaint, plaintiffs are "at least entitled to seek a declaration that any expenditures that they do undertake must be reimbursed by [the defendant]"). The plaintiff has not proven that she has taken action to remediate the contamination on her property caused by the defendant. She removed oil drums and other hazardous waste materials left on the property by her husband but these were not connected to the plume of contamination flowing from Miller-Stephenson. She is not entitled to relief for the costs of investigating the contamination.

SIXTH COUNT

*11 The sixth count is brought pursuant to General § 22a-16, which is part of the Environmental Protection Act (EPA). The EPA provides at General Statutes § 22a-15 that "there is a public trust in the air, water, and other natural resources of the state of Connecticut ... [I]t is in the public interest to provide all persons with an adequate remedy to protect the air, water, and other natural resources from unreasonable pollution, impairment or destruction." "The broad language of the act gives any person the right to bring an action for declaratory and equitable relief against pollution. It is clear that one basic purpose of the act is to give persons standing to bring actions to protect the environment." *Belford v. New Haven,* 170 Conn. 46, 53- 54, 364 A.2d 194 (1975). Any member of the general public can initiate an action "to raise issues involving the public trust in air, water, or other natural resources of the state." *Bombero v. Planning & Zoning Commission,* 40 Conn.App. 75, 88, 669 A.2d 598 (1996). Statutes such as section 22a-16 "are remedial in nature and should be liberally construed to accomplish their purpose." *Manchester Environmental Coalition v. Stockton,* 184 Conn. 51, 57, 441 A.2d 68 (1981).

To establish a prima facie case under § 22a-16, the plaintiff must establish that "the conduct of the defendant, acting alone, or in combination with others, has, or is reasonably likely unreasonably to pollute, impair, or destroy the public trust in the air, water or other natural resources of the state ..." General Statutes § 22a-17; *Manchester Environmental Coalition v. Stockton, supra,* 184 Conn. 57-58. The defendant need not act negligently or otherwise culpably. *Id.,* 59-60 (two parties' conduct, even when not acting in concert, may cause unreasonable pollution even though each party alone is not acting unreasonably). This factor

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d                                                                Page 10
(Cite as: 1998 WL 661445 (Conn.Super.))

distinguishes § 22a-16 from § 22a-452, which requires culpable conduct.

"Once a prima facie case is shown, the burden of production shifts to the defendant. Under § 22a-17, 'the defendant may rebut the prima facie showing by the submission of evidence to the contrary.' As stated in *Ray v. Mason County Drain Commissioner,* [393 Mich. 294, 311-12, 224 N.W.2d 883 (1975) ], '[t]he nature of the evidence necessary to rebut plaintiff's showing will vary with the type of environmental pollution, impairment or destruction alleged and with the nature and amount of the evidence proffered by the plaintiff. In some cases, no doubt, testimony by expert witnesses may be sufficient to rebut plaintiff's prima facie showing. While in other actions the defendant may find it necessary to bring forward field studies, actual tests, and analyses which support his contention that the environment has not or will not be polluted, impaired or destroyed by his conduct. Such proofs become necessary when the impact upon the environment resulting from the defendants' conduct cannot be ascertained with any degree of reasonable certainty absent empirical studies or tests." *Manchester Environmental Coalition v. Stockton, supra,* 184 Conn. 60.

*12 General Statutes § 22a-18(a) provides that "[t]he court may grant temporary and permanent equitable relief, or may impose such conditions on the defendant as are required to protect the public trust in the air, water and other natural resources of the state from unreasonable pollution, impairment or destruction," and § 22a-18(e) allows the plaintiff to claim attorneys fees and costs.

The statute does not provide a specific statute of limitations. while § 52-577c seems the most applicable, not all cases that could be brought would necessarily be for injuries caused by exposure to hazardous pollutants. Moreover, by definition, any damages caused would have to be continuing to pose a current threat to the environment, and thus would be similar to a continuing nuisance. It also does not appear to require continuing conduct by the defendant. "The language of § 22a-16 ... certainly appears to contemplate the possibility of a suit by a private citizen against an entity other than the state for the consequences of past pollution." *Hartt v. Schwartz, supra,* 20 CONN. L. RPTR. 460.

The plaintiff has presented a prima facie case by showing that a protectible natural resource, water, is being impaired by the actions of the defendant. The plaintiff did not provide sufficient evidence to indicate the direction of groundwater flow on her property. However, the court can reasonably infer that contaminants on her property migrate to the wetlands on her property and from there to streams in the area. Buzea testified that contaminants in bedrock would travel through bedrock fractures. Since Miller-Stephenson has not excavated the soil which is the source of much of the contamination, and since no remediation has occurred on the Blackburn property it is not possible to determine the extent of the contamination.

In addition, § 22a-17 provides that the defendant's conduct may be considered acting alone, or in combination with other. "This recognizes the fact that a person may be polluting the environment but that his pollution alone may not be reasonable. But when his pollution is introduced into the environment in combination with others, it may become unreasonable." *Manchester Environmental Coalition v. Stockton,* 184 Conn. 51, 60, 441 A.2d 68 (1981). The defendant did not succeed in rebutting the plaintiff's prima facie case by showing evidence to the contrary. The defendant, in fact, emphasized the proximity of the Danbury airport and also Valluzzo's activities as sources of contamination. However, it is the defendant's chemical pollution migrating from the source near the defendant's buildings that has brought TCA, DCE, DCA and freons onto the plaintiff's property. The fact that bottled water was provided to the residents of 49 Backus Avenue, which is adjacent to the defendant's property, is evidence that the contamination affected property other than the plaintiff's. In addition, the defendant failed to rebut the prima facie case by setting forth a "feasible and reasonable alternative." *Id.,* 61-63, 441 A.2d 68. It cannot do so because it has failed to take even those steps which would remediate the source of the pollution on its own land. It has conducted no studies to determine the extent of the migration of pollutants onto adjacent properties and the means to remediate that pollution. Therefore, it has no alternatives to offer beyond having provided bottled water and sewer hook-ups.

*13 For the foregoing reasons, the court finds that the plaintiff has sustained her burden of proving that the contamination violates the public trust.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d
(Cite as: 1998 WL 661445 (Conn.Super.))

CLAIMS FOR RELIEF

The plaintiff seeks money damages for the diminution of the fair market value of her property. In 1988 an appraisal of the property was done for her attorney in connection with the dissolution proceedings. The fair market value of the land was estimated to be $536,250 and of the building, $27,646 for a total estimated value of $563,896. The appraisal noted that the property value was adversely affected by being designated "inland wetlands." The real estate appraiser noted that the value of the property was 65% of the value of other commercial property in the area because of the lack of visibility, lack of city utilities and the overall appeal and marketability. No additional evidence was provided to indicate the increase in value, if any, due to the connection of the property to city water. Since an offer of $550,000 had been made at the time of trial, the court cannot find a diminution in value, especially since the plaintiff's realtor testified that he thought the property overpriced at $700,000.

The plaintiff also claims $4000 in lost rental payments. The plaintiff did not bear her burden of proving she suffered lost rental payments solely as a result of the well water contamination.

While the well water contamination may have been one of the factors involved in the tenant's move, it was not the only one. Whitlock wrote the plaintiff on January 26, 1993 stating that he would cease paying rent due to the problems with the well water, although at that time he was receiving bottled water. However, two days before he wrote that letter, the plaintiff had met with him to discuss a problem regarding his dog. The dog was defecating and leaving a mess inside the building. Blackburn told Whitlock to solve the problem and clean up the mess. She returned on January 26 and found a worse mess and again advised the tenant to clean it up. The day after the tenant's letter, she visited the property and left Whitlock a note because the mess was worse still. On January 29 she returned and found the situation unimproved. She asked Whitlock if Valluzzo had "put him up to this" and whether the dog problem had been resolved. When Whitlock said it had not, she told him he was trespassing on her property. In March Whitlock left the premises. The plaintiff cleaned up some debris on the property, such as oil drums, in order to attract a new tenant. In September 1993 she rented

both the apartment and the shop for the sum of $1000 per month. That tenant was still renting at the time of the hearing. Based on the foregoing, the court cannot find that Blackburn lost Whitlock as a tenant because of the defendant's actions. In addition she recouped her losses by virtue of the doubling of the rental amount. Had not Whitlock vacated she would not have had occasion to seek a new tenant.

*14 The plaintiff also seeks legal expenses and court costs pursuant to General Statutes § 22a-18(e). Based on the agreement of the parties, the court will have a hearing with regard to costs, including reasonable costs for witnesses, and a reasonable attorneys fee. [FN3]

> FN3. The parties are directed to contact the clerk to arrange a hearing to be held during the week of November 2, 1998.

Blackburn seeks an order requiring the defendant to remediate all environmental contamination present at her property. Miller-Stephenson argues, however, that Blackburn's site requires no remediation because it lies in a GB groundwater classification area, which permits the presence of higher levels of contaminants. Since Blackburn's property is now served by the public water supply, the argument is that groundwater there does not require remediation. In addition, the defendant posits that no remediation is necessary on Blackburn's property because there are no criteria regulating the presence of freons. While Connecticut has promulgated no standards for the presence of freons, other states, such as New York and New Jersey have issued such regulations. In addition, it is possible to do calculations to determine the level of freons. The defendant further argues that the level of TCA on Blackburn's property in 1993 did not exceed the state's surface water, ground water or volatilization criteria. The defendant argues that the GB criteria indicate that no remediation is necessary on Blackburn's property; that even where dichloroethylene was discovered on the plaintiff's property in excess of the pollutant mobility criteria, it was found in a well depth below 15 feet and that pollutants would not cause contamination through ingestion. The defendant further argued that the plaintiff's property was contaminated by industrial waste from

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d
(Cite as: 1998 WL 661445 (Conn.Super.))

Valluzzo's machine shop operation. After Blackburn took title to the property she shipped "waste oil" off the property. However, this waste oil was not a hazardous material as defined by the Connecticut regulations. None of these arguments, therefore, addresses the issue of whether Miller-Stephenson created a nuisance or caused a trespass on the plaintiff's property.

The defendant is to remediate contamination at the plaintiff's property from TCA, DCE, DCA, freons and benzene. The remediation plan of the plaintiff's expert is to be implemented as to the installation and monitoring of three interceptor wells on Blackburn's property to determine the extent of the contamination, to prevent migration, and to remediate so that state and federal standards or calculable standards are not exceeded for the location and use of the property. The cost of installing these wells is estimated to be $10,000 and the cost of monitoring is be $2000 per month. These costs shall be borne by the defendant. In the event that sampling results demonstrate a need for additional wells or other remedial actions, the parties will seek the recommendation of DEP as to the steps to be taken. If there is no agreement, the parties will return to court for an evidentiary hearing as to the nature, extent, necessity and cost of such additional steps. The parties are to file a status report with the court 27 months from the date of this decision if they have not returned to court in the interim.

*15 Further, the court enjoins the defendant from continuing to permit contaminants to migrate onto Blackburn's property in levels that exceed state or federal standards or calculable standards for the location and use of the property. The court recognizes that Buzea recommended the installation of three recovery wells on the defendant's property along Backus Avenue. Had the plaintiff requested remediation of Miller-Stephenson property, this court might have been inclined to so order. The court does not direct Miller-Stephenson to undertake specific remediation measures on its own property since its proposal is being reviewed by DEP. The defendant is ordered to advise DEP that any remediation plan must have as one of its objectives the termination of the nuisance and trespass of Blackburn's property.

The defendant certainly did not take the initiative in environmental compliance; it appealed an order of September 1992, an appeal which led to a consent order of February 1993 in which the defendant refused to admit findings that contaminants had been discharged from its property; while it exercised its rights it failed to take significant steps toward remediation such as soil venting that would have alleviated some of the contamination. Its delays were compounded by the delays in DEP's review of the case. Miller-Stephenson did not remove contaminated soil because it feared that, without DEP approval, it might be required to excavate once again if DEP decided that not enough soil had been excavated. Were the defendant to follow its expert's recommendation it could excavate the source area of the contamination and, if there were still contaminants present in levels that exceed standards, it could excavate incrementally until such levels were no longer present. In view of its reluctance to remediate, the defendant is further ordered to contact DEP monthly in order to expedite the review of its remediation plan.

As for the plaintiff's claim for indemnification, the court sees no reason to grant it at this time. The plaintiff will have that remedy available to her pursuant to General Statute § 22a-452 if she expends her own funds in remediating in the future.

There is insufficient evidence to award the plaintiff damages for aggravation and worry.

Accordingly, judgment may enter for the defendant on the first, second and fifth counts. Judgment shall enter for the plaintiff on the third and fourth counts. The court shall retain jurisdiction with regard to these counts to monitor compliance.

Judgment shall enter for the plaintiff on the sixth count. The award of fees and costs is to be determined by the court after a hearing.

1998 WL 661445 (Conn.Super.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Westlaw.

Not Reported in A.2d                                              Page 1
(Cite as: 2002 WL 1293224 (Conn.Super.))

**H**
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of Connecticut.

Edward VISCONTI, Jr. et al.,
v.
PEPPER PARTNERS LIMITED PARTNERSHIP
et al.

**No. X06CV990170072S.**

May 14, 2002.

ROBERT F. McWEENY, J.

*1 This litigation concerns the 1996 sale of
property located in Milford, Connecticut which,
during the 1930s, had been used by gasoline service
stations, used car lots and/or car repair (body shop)
garages. The plaintiffs in the action (Edward A.
Visconti, Jr ., Edward A. Visconti, Jr. d/b/a E.A.
Visconti & Sons a/k/a Visconti & Sons; Surrogate
Wheels of Milford, Inc. and Auto Specialists of
Milford, LLC) include the purchaser of the
property, Edward A. Visconti, Jr. (Visconti) and
related entities. The defendants include the seller of
the property, Pepper Partners Limited Partnership
(Pepper Partners), Ernest A. Wiehl, Jr. (Wiehl) and
Richard V. Wiehl and Consumer Petroleum of
Connecticut Incorporated (Consumer Petroleum).
The plaintiffs essentially claim that the property is
environmentally contaminated and that the
defendants are liable to them because of the
condition of the property and the conditions
associated with the sale of the property.

The complaint is in 12 counts. The original
complaint filed March 1, 1999, has been amended
and revised. The operative complaint is dated

February 8, 2001. The 12 counts of the complaint
are as follows: fraud (count 1); fraudulent
nondisclosure (count 2); fraudulent prevention of
inquiry (count 3); civil conspiracy (count 4); breach
of the covenant of good faith and fair dealing (count
5); breach of contract (count 6); negligent
misrepresentation (count 7); negligence (count 8);
negligence per se pursuant to General Statutes §
22a- 427 (count 9); liability under General Statutes §
22a-452 for reimbursement (count 10); liability
under General Statutes § 22a-16 (count 11); and a
claim for violation of the Connecticut Unfair Trade
Practices Act (CUTPA) (count 12). Pursuant to
Practice Book § 17-44, the defendants have moved
for summary judgment on all twelve counts of the
amended complaint. The plaintiffs have opposed the
motion for summary judgment.

The real property of interest is located at 199-211
Naugatuck Avenue, Milford, Connecticut. The
property was purchased by Wiehl in 1980. Wiehl
leased the property to the defendant Consumer
Petroleum, which, in turn, subleased the property to
third-party entities that operated gasoline service
stations, used car lots and/or car repair garages on
the property until 1989. In 1989, Wiehl transferred
title of the property to defendant Pepper Partners.
Pepper Partners is a limited partnership. Prior to
February of 2000, Wiehl was the general partner
with a 99% ownership interest in the partnership,
and his wife was a limited partner with a 1%
ownership interest.

The defendant Richard Wiehl is the son of Ernest
Wiehl. He is neither employed by Pepper Partners,
nor does he have any ownership interest in the
partnership.

The defendant Consumer Petroleum is a
Connecticut corporation whose primary business is
the wholesale delivery of petroleum products to
gasoline service stations. Wiehl was president,
director and sole shareholder of Consumer
Petroleum until December of 1990. In December of
1990, his interest in Consumer Petroleum was
transferred to his son, the defendant Richard Wiehl.
The defendants Consumer Petroleum and Richard
Wiehl have never had an ownership interest in the

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d                                                    Page 2
(Cite as: 2002 WL 1293224 (Conn.Super.))

subject property. None of the defendants have operated a gasoline service station or a car repair facility on the property at any time. None of the defendants has ever held an ownership interest in the entities that operated service stations or garages on the property. Consumer Petroleum supplied petroleum products to the tenants operating service station garages on the property.

*2 Plaintiff Visconti had some familiarity with the property, having worked on the property at a service station in 1977. He was first interested in purchasing the property in 1989, at which time he filed a request with the Milford Health Department Division of Environmental Health to obtain information concerning environmental problems on the property. In late 1994 or early 1995, Visconti observed a realtor's sign on the property. In early 1995, he visited the property with a realtor (Art Overfield). Knowing that the property had been used as a service station, Visconti inquired about the underground gasoline storage tanks. Overfield responded that the tanks, along with the septic tank and the service station islands, had been removed and backfilled with clean soil. Visconti noticed a visible difference in the soil where new fill had been brought in. Visconti had a subsequent conversation with Overfield concerning the terms of the sale, but had no further discussions about the condition of the property. Visconti made an offer for the purchase of the property, which prompted a meeting with Wiehl. In their discussion, the terms of the purchase were agreed upon, whereby Visconti would buy the property for $200,000 ($5,000 in cash and $195,000 in a purchase money mortgage on the property). Wiehl reiterated Overfield's report that the underground gas storage tanks, septic tanks and service station islands had been removed, along with contaminated soil and clean soil brought in so as to "satisfy the authorities." These conversations, one with Overfield and the other with Ernest Wiehl, were the only conversations that Visconti had with any agent or representative of the seller.

Based on these discussions, Visconti assumed that the soil was contaminated around the tank area (Visconti May 15, 2001 deposition, p. 96; Second Request to Admit p. 17.) Visconti acknowledged at his deposition that he was never informed there was no contamination left on the property (Visconti May 15, 2001 deposition, pp. 192-93; Visconti, May 31, 2001 deposition, p. 20). Visconti indicated that neither Wiehl nor Overfield told him whether or not

to have the property tested for environmental problems.

Visconti and Pepper Partners entered into a written sales contract providing that the buyer at his own expense could "make such inspection of the premises (including, without limitation, a Phase I environmental site assessment) as buyer deems appropriate." Visconti reviewed the contract with his attorney. Visconti did not complete the due diligence provision of the contract or undertake any investigation of the property prior to the sale. The sales contract provided that the buyer, Visconti, had inspected the property and was fully satisfied with its physical condition; that neither the seller nor any representative of the seller had made any representation, promise or warranty of any kind relating to the condition of the property; and that the buyer was accepting the property in substantially its present condition. The sales contract also expresses that Visconti was advised that the property "may fall within the definition of an 'establishment'; that Pepper Partners had made no representations of any kind ... concerning the environmental condition of the property; and that Pepper Partners would have no obligation to provide or execute a statutorily required environmental certificate form." According to the contract, Visconti would provide and execute the requisite forms, pay all the fees associated with the environmental filings, assume responsibility for environmental testing and any necessary cleanup of the property, and indemnify Pepper Partners for any loss arising out of environmental conditions on the property.

*3 General Statutes § 22a-134 addresses the "transfer of hazardous waste establishments." An establishment would include, pursuant to § 22a-134(3)E, property whereupon a vehicle body repair shop or vehicle painting shop was located on or after May 1, 1967. The property conveyed had been the site of a vehicle body repair shop and vehicle painting shop during the 1980s. When property with such a history is transferred, General Statutes § 22a-134a mandates that an environmental condition assessment form (ECAF) and a property transfer program-form III (Form III) must be completed as part of the sale. The ECAF provides that the certifying party must provide information known to him regarding the environmental condition of the property being transferred. The Form III provides that the certifying party agrees to

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d
**(Cite as: 2002 WL 1293224 (Conn.Super.))**

Page 3

take responsibility for pollution of environmental property found on the property being transferred. Pursuant to the sales contract, it was Visconti who assumed the obligation to complete and sign the environmental forms, pay the required filings fees, and assume the responsibilities for the environmental condition of the property.

Prior to the closing, Pepper Partners' attorney indicated to Visconti's attorney that the transfer act provisions would have to be complied with unless Visconti could prove to Pepper Partners that the property was not a General Statutes § 22a-134 "establishment." Pepper Partners' attorney suggested to Visconti's attorney that Visconti might wish to undertake an environmental study before closing. Pepper Partners indicated that Visconti would have to file the Form III with the Department of Environmental Protection (DEP), pay the filing fees in excess of $2,000, and file the ECAF. Visconti was advised through counsel that Pepper Partners would release Visconti from his obligations under the sales contract, but would not sell without the transfer act filings or the filing fees certified and paid by Visconti. Pepper Partners also indicated that it would extend the time to close to allow reasonable time for Visconti to conduct any pre-closing investigation of the property. Visconti declined to perform such a site investigation, and agreed to assume responsibility for the transfer act filings and payment of the filing fees.

Pepper Partners' attorney provided to Visconti's attorney the ECAF and Form III with certain information, including a reference to the fact that a prior tenant had operated an auto body repair shop on the property. Pepper Partners' attorney understood that Visconti's attorney would review the information with his client and change the forms to reflect what Visconti knew about the environmental condition and history of the property. Visconti and his attorney made no changes in the ECAF or Form III that Visconti executed. The closing occurred on February 9, 1996. Visconti has not paid the note and mortgage since April of 1996.

"[S]ummary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law ... A material fact is a fact that will make a difference in the result of the case ... The party seeking summary judgment

has the burden of showing the absence of any genuine issue as to all material facts which, under applicable principles of substantive law, entitle him to a judgment as a matter of law ... and the party opposing such a motion must provide an evidentiary foundation to demonstrate the existence of a genuine issue of material fact ... In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party ..." (Citation omitted; internal quotation marks omitted.) *DaCruz v. State Farm Fire & Casualty Co.,* 69 Conn.App. 507, 511 (2002) . "In ruling on a motion for summary judgment, the court's function is not to decide issues of material fact, but rather to determine whether any such issues exist ..." (Citation omitted.) *Nolan v. Borkowski,* 206 Conn. 495, 500, 538 A.2d 1031 (1988).

**\*4** The essence of all of the plaintiffs' claims is that the defendants had knowledge of environmental problems on the property and did not properly inform the buyer concerning such hazards. The plaintiffs cite a Milford Fire Marshal order dated November 24, 1987, regarding safety code violations with respect to the abandoned gas tanks. In 1988, the defendants engaged in environmental cleanup in the form of removal of the underground gasoline storage tanks, the gas pumps and septic tanks, some contaminated soil and its replacement with clean fill. Tests taken in 1988 revealed contamination on the site. Following the 1988 cleanup and the eviction of the then-tenant, Consumer Automobile Purchasing Services (CAPS), the property was vacant from 1989 through the plaintiffs' purchase in 1996.

In order to recover on their fraud claims, the plaintiffs must allege the essential elements of an action in common law fraud. Those elements are that (1) a false representation was made as a statement of fact; (2) it was untrue and known to be untrue by the party making it; (3) it was made to induce the other party to act on it; and (4) the other party did so act upon that false representation to his injury. *Barbara Weisman, Trustee v. Kaspar,* 233 Conn. 531, 539-40, 661 A.2d 530 (1995); *Billington v.. Billington,* 220 Conn. 212, 217, 595 A.2d 1377 (1991); *Kildoff v.. Adams, Inc.,* 219 Conn. 314, 329, 593 A.2d 478 (1991). All four elements must be found to exist and the absence of any one of them is fatal to a recovery on a fraud claim. *Citino v. Redevelopment Agency,* 51 Conn.App. 262, 276, 721 A.2d 1197 (1998).

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d                                                                    Page 4
(Cite as: 2002 WL 1293224 (Conn.Super.))

The undisputed facts establish that the only two
agents of the defendants (Wiehl and the real estate
agent, Overfield) accurately represented the
removal of the underground storage tanks, septic
tank and gas service islands and contaminated soil.
They also accurately noted the replacement with
clean fill, which was observed by Visconti. The
plaintiff Visconti stated that neither Wiehl nor
Overfield represented that the property was
environmentally clean. The only representation by
the defendants that might equal a false
representation would be the statement attributed to
Wiehl that the 1983 cleanup satisfied the authorities.

The plaintiff cites the ECAF and Form III as other
false representations. However, these documents are
not signed by any of the defendants and, under the
sales contract, are solely the responsibility of
Visconti. Visconti's testimony is that he did not see
the ECAF or Form III prior to the closing and did
not read either form prior to signing them. Thus,
there is no evidence whatsoever that he relied on
them.

Assuming for the purpose of this motion that the
representation by Wiehl--that the 1998 cleaning
"satisfied the authorities"--was a knowingly untrue
statement, there still must have been reliance by
Visconti on that representation for him to recover
on a fraud claim. In support of their claim of
reliance, the plaintiffs cite and attach to their
memorandum in opposition of the motion for
summary judgment two pages of Visconti's
deposition testimony. The pertinent parts of the
deposition excerpts are as follows:
*5 Q So I'm trying to figure out is what it is that
they never told you that the property was clean
but yet you say it was supposed to be clean. Why
was it supposed to be clean?
A They took the tanks out. They took the soil.
They brought clean soil in. They didn't tell me
that it was clean but they didn't tell me there's still
contamination on the place, either.
Q Again, nothing prevented you from going and
finding out?
A But I didn't know that. Sorry. I really didn't
know about that. If I did or they said it was a
possibility, I would have just walked away.
Visconti 5/31/02 deposition, p. 186, lines 1-13.
Q No. I'm not. I'm asking you whether they ever
told you this property is clean, there's no
contamination on that property? Anyone ever tell
you that?

A No. That, they didn't say, that it is spotless
clean. Okay. They didn't tell me it was dirty,
either.
Q They told you they removed some soil and
replaced it with some clean dirt?
A When they took the tanks they took soil and
spent a lot of money on the clean up.
Q But they never told you there's no
contamination left on the property?
A They never told me that, no. They didn't.
Q They didn't say one way or the other?
A One way or the other.
Visconti 5/15/01 deposition, p. 193, lines 1-14.

The defendants point out that Visconti in his May
15, 2001 deposition at page 96 believed that the soil
"was contaminated around the tank area." It is also
clearly and factually accurate that the defendants
had, indeed, spent a lot of money on the 1988
cleanup, in excess of $50,000.

The undisputed facts also provide that the sales
contract places the entire burden for the
environmental condition of the property on the
buyer (Visconti), who had the opportunity to
conduct a pre-sale investigation, including
specifically a "Phase I environmental site
assessment." Affidavits of counsel also establish
that Visconti was afforded the opportunity to obtain
additional time in which to undertake any site
investigation, and was offered the opportunity to
walk away from his obligations under the contract if
he did not want to execute the ECAF and Form III
environmental forms.

In count two, the plaintiffs assert a claim for
fraudulent non-disclosure of facts discovered in the
1988 cleanup revealing contamination of the
property. A claim based on fraudulent
nondisclosure, also alleged in counts one and three,
is not available when a property is purchased "as
is." *Holly Hill Holdings v. Loehmann,* 226 Conn.
748, 628 A.2d 1298 (1993). The specific holding in
*Holly Hill* was that the buyer was precluded from
asserting claims on the basis of alleged
non-disclosure of known facts. *Id.,* at 755-56. In
this case, Visconti purchased the property in its
present condition not "as is," but that it is a
distinction without a difference in view of the
specific assumption by Visconti of responsibility for
the environmental condition of the property. The
party who assumes the risk under a contract and
relies on only limited information assumes the risk

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

of his mistake. *Pacelli Bros. Transportation, Inc. v. Pacelli*, 189 Conn. 401, 408, 456 A.2d 325 (1983). The specific contractual assignment of the environmental risk to Visconti would further preclude any disclosure obligation on the part of any of the defendants.

**\*6** The fraudulent prevention of inquiry claim in the third count is unsupported by any materials provided by the plaintiffs. In contrast, the defendants rely on the specific provisions of the contract allowing due diligence, including a specific reference to a Phase I environmental investigation, as well as the affidavits of counsel to the effect that prior to closing, Visconti was expressly offered the opportunity for a delay in closing to do a specific environmental site inspection. The most that Visconti asserts is that the defendants didn't tell him to get a Phase I, even though their attorney suggested to Visconti's attorney that he get one.

Summary judgment enters for all defendants on counts 1, 2 and 3 of the amended complaint.

### Conspiracy

The plaintiffs' claim of conspiracy d in count four alleges that the defendants conspired to induce Visconti to purchase the property and shift to him the liability for environmental contamination. The basic requirement for a civil conspiracy claim is a combination between two or more persons. *Marshak v. Marshak*, 226 Conn. 652, 665, 628 A.2d 964 (1993).

At all relevant times, Wiehl was the general partner and beneficial owner of Pepper Partners. Consumer Petroleum, which at the relevant period was wholly owned by Wiehl, never owned the property and had nothing to do with the 1996 sale of the property to Visconti or the 1980 transfer from Wiehl to Pepper Partners. Wiehl's son, Richard Wiehl, was involved only to the extent that he had discussions about the property with Pepper Partners' attorneys. The conspiracy to encompass Consumer Petroleum would have to date back to 1989, some five years before any of the defendants were aware of the plaintiffs' interest in purchasing the property. The undisputed facts are that Visconti was represented by legal counsel, was not told by any of the defendants or their agents that the property was environmentally clean, specifically contracted to assume the environmental risks, was offered the

opportunity to undertake a site investigation, including a Phase I environmental investigation, and assumed the filing obligations and environmental risks. There is no evidence to support a claim of civil conspiracy in the absence of any fraud on the part of any of the defendants.

The defendants are all entitled to summary judgment on the civil conspiracy count.

### Breach of Covenant of Good Faith and Fair Dealing

The implied covenant of good faith and fair dealing relied upon in count five is essentially a rule of construction designed to fulfill the reasonable expectations of the contracting parties as they presumably intended. *Eis v. Meyer*, 213 Conn. 29, 36-37, 566 A.2d 422 (1989). The principle cannot be applied to achieve a result contrary to the clearly expressed terms of a contract. *Magnan v. Anaconda Industries, Inc.*, 193 Conn. 558, 567, 479 A.2d 781 (1984).

The plaintiffs argue in their opposition papers that a party cannot take advantage of its own wrong to injure the right of the other to receive the benefits of the agreement. The plaintiffs claim that the intent of the parties entering into the sales contract was to transfer clean property to plaintiff Visconti, not to transfer responsibility for cleaning the property. That argument is totally unsupported by the deposition of Visconti, who stated that there was no representation that the property was clean; it also is explicitly contrary to the sales contract, which placed the environmental risk on the plaintiff Visconti.

**\*7** All defendants are entitled to summary judgment on the breach of covenant of good faith and fair dealing count.

### Breach of Contract

Count six of the amended complaint asserts a breach of contract claim but does not articulate the specific provision of the sales contract, note or mortgage which was allegedly breached. There is no evidence to support any claim that the only defendant contracted with, Pepper Partners, in any way breached its contract of real estate conveyance, note or mortgage. The other defendants had no contractual relationship with the plaintiffs.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works